**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**CALAIS REGIONAL HOSPITAL,**[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-_____ |

**DECLARATION OF RODNEY BOULA IN SUPPORT OF CALAIS REGIONAL HOSPITAL'S CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS**

I, Rodney Boula, declare, pursuant to § 1746 of title 28 of the United States Code, that:

1. I am the chief executive officer ("CEO") of Calais Regional Hospital ("CRH" or the "Debtor"). I have 35 years of experience in hospital administration, with 32 years of experience as a chief executive officer of a hospital and 18 of those 32 years serving as both a chief executive officer and a chief financial officer of a hospital. I have served as CEO of the Debtor since March of 2016.

2. I am familiar with the Debtor's day-to-day business operations, business, and financial affairs. I am authorized by the Debtor to submit this Declaration in support of its chapter 11 petition and the various first day motions described in this Declaration.

3. On July 30, 2019, the Debtor's board of directors (the "Board") held a meeting and, by a voice vote, adopted a resolution (the "Resolution") authorizing the filing of the Debtor's bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This Resolution is or will be filed on the docket in this case on this same day.

---

[1] The last four digits of the taxpayer identification number of Calais Regional Hospital are 1783. *See* 11 U.S.C. § 342(c)(1). The principal office of Calais Regional Hospital is located at 24 Hospital Lane, Calais, Maine. *Id.*

4.  On September 17, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. That same day, the Debtor also filed the following motions (collectively, the "First Day Motions"):

(a)  Motion For Authority To Use Cash Collateral On An Interim Basis And Scheduling A Hearing Authorizing The Use Of Cash Collateral On A Final Basis (the "Cash Collateral Motion");

(b)  Motion For Authority To Pay Pre-Petition Wages, To Maintain Existing Insurance Coverage, And For Related Relief (the "Payroll Motion");

(c)  Motion For Order Authorizing Use Of Pre-Petition Cash Management And Payment Systems On An Interim Basis And Scheduling A Hearing For Use Of The Debtor's Cash Management And Payment Systems On A Final Basis (the "Cash Management Motion"); and

(d)  Motion To Set First Day Motions For Hearing On An Emergency Or Expedited Basis (the "Emergency/Expedite Motion").

5.  This Declaration is submitted in support of these First Day Motions.

6.  All facts set forth in this Declaration are based on my personal knowledge; on information supplied to me by others within the Debtor's organization; upon my review of relevant documents; or on my opinion, based on my experience and knowledge of the Debtor's operations, financial condition, and present liquidity needs. If I were called to testify, I would testify competently as to the facts in this Declaration.

## I.  The Debtor's Inception

7.  The Debtor is a Maine non-profit business corporation located in Calais, Maine. The Debtor first incorporated in 1917 and has a mission "to provide and plan patient care, educational and restorative services that meet our customers' expectations, commensurate with available resources." The Debtor's vision statement is that it "will be known by our customers as the best rural hospital in Maine."

8. The Debtor services patients in eastern Washington County, Maine, and also provides services to some Canadian patients (the "Service Area"). Communities in Maine within the Service Area span from Topsfield (about 36 miles/45 minutes north), to Edmunds (about 31 miles/40 minutes south), to Wesley (about 30 miles/35 minutes west).

## II. The Debtor's Business And Background Information

### A. Overview Of The Debtor's Business

9. The Debtor operates a 25-bed general medical and surgical hospital located in Calais, Maine, with approximately 259 employees and approximately 216 full-time equivalent positions. It is devoted to improving the health and quality of life for patients in Calais and providing the entire Service Area with exceptional patient care that is compassionate, cost effective, and community-based.

10. The Debtor provides the following services, among others, to patients in its Service Area: (a) **inpatient services** including end-of-life care, nursing care to support transitions to home ("swing bed" care), and hospitalist services to coordinate inpatient care; (b) **outpatient services** including cardiology testing, emergency department services, lab testing, and outpatient medical procedures (e.g., blood transfusions, injections, would care); (c) a range of **imaging services** including CT scanning, mammography, MRI, and ultrasound; (d) **therapy rehabilitation services** including alternative pain management, occupational therapy, physical therapy, speech therapy; (e) limited **general surgical services** (and providing an operating room to visiting specialists); (f) **primary care services**; (g) numerous types of **specialty care** primarily provided by physicians utilizing the Debtor's facilities; and (h) support for community groups.

11. The Debtor's emergency department has 9 beds and is supported by 24-hour coverage of testing facilities, including laboratory testing and radiology. The Debtor's average

daily inpatient census is about 8 patients. Acute patients are typically discharged within 96 hours. The Debtor also has "swing beds"—essentially beds used for rehabilitative, non-acute care for patients who "swing" from acute to rehabilitative care.

12. In 2018, there were a total of 38,013 inpatient, swing unit, emergency department, and outpatient visits and a total of 652,988 patient procedures performed.

13. The Debtor provides the majority of its services at its hospital campus, which is located at 24 Hospital Lane, Calais, Maine. The Debtor also operates primary care physician practices at other locations. The Debtor operates several physician practices as 37 Palmer Street, Calais, Maine. They include CRMS Family Medicine, CRMS Internal Medicine, CRMS Pediatrics, and CRMS Pulmonology. The Debtor operates several physician practices at 15 Palmer Street, Calais, Maine. They include: CRMS Surgical Services and CRMS Orthopedics. The Debtor also provides services through CRMS Baileville at a location on Washington Street, Baileyville, Maine. The Debtor also has a non-debtor affiliate that provides home health care. This company is named Calais Regional Health Services ("CRHS").

14. The Debtor is the only hospital in Calais and plays an important role as a hospital required to provide care to patients for most procedures regardless of their ability to pay. The nearest hospitals in the United States are Downeast Community Hospital in Machias, Maine (about 45 miles and a 60 minute drive) and Eastern Maine Medical Center in Bangor, Maine (about 95 miles and a drive that is just under two hours). There is a hospital located in St. Stephen, New Brunswick, on the other side of the United States-Canadian border.

15. Many patients within the Service Area face long travel times—even without inclement weather—to obtain hospital-level services at the Debtor's facility in Calais. If the Debtor shuts down, then many patients in the Service Area would face even longer travel times to

obtain hospital services in Machias or Bangor. Increased distances to emergency rooms are correlated with worse health outcomes. Kelly, C., Hulme, C., Farragher, T., & Clarke, G., *Are differences in travel time or distance to healthcare for adults in global north countries associated with an impact on health outcomes? A systematic review. BMJ open*, *6*(11), e013059. doi:10.1136/bmjopen-2016-013059 (Nov. 24, 2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5178808/# (last visited August 29, 2019).

16. By virtue of the Debtor's rural location, size, and certain services that it provides, it qualifies as and is a critical access hospital under the Medicare and Medicaid programs. Congress created the critical access hospital designation in 1997 in order to reduce the financial vulnerability of rural hospitals while also ensuring that essential health services are available to rural communities. *See* RHIhub, Critical Access Hospitals, https://www.ruralhealthinfo.org/topics/critical-access-hospitals (last visited August 29, 2019). To meet the designation criteria, a hospital must not be closely located to another nearby hospital, must maintain no more than 25 inpatient beds, and must have 24-hour emergency services. 42 C.F.R. §§ 485.610(c), 485.618(a), 485.620. The Debtor meets these criteria.

    **B.**    **Events Leading To The Debtor's Chapter 11 Filing**

17. I became chief executive officer of the Debtor in March of 2016, following several years of losses by the Debtor. Since that time, the Debtor has been working to implement operational changes to strengthen business operations and ensure its continued viability into the future. The Debtor's business has improved, and net losses have contracted significantly, but there is more work required to fully stabilize the Debtor and to position it for success into the future. The Debtor also faces current cash shortfall issues that require a restructuring of its balance sheet as well as the benefit of additional operational changes.

18. [Reserved.]

19. [Reserved.]

C. **The Debtor's Pre-Petition Secured Debt Structure**

20. The following description of the Debtor's pre-petition secured debt structure is based on a preliminary investigation. The Debtor, as debtor and debtor-in-possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

1. **Katahdin Trust Company**

21. Based on a review of relevant documents, it is my understanding that Katahdin Trust Company ("KTC") claims to be a creditor of the Debtor by virtue of the Debtor's execution and delivery of several promissory notes memorializing term loans (the "KTC Loans") in the original aggregate principal amount of $5 million. According to the Debtor's books and records, as of September 9, 2019, the outstanding principal balance on the KTC Loans was $3,639,344.60.

22. KTC may claim a mortgage interest in the Debtor's real estate located at 24 Hospital Lane to secure the KTC Loans (the "KTC Mortgage"). The hospital campus is located at 24 Hospital, Lane, Calais, Maine.

23. It is my understanding that KTC has filed a financing statement with the Maine Secretary of State's Office naming the Debtor as its debtor and describing its alleged collateral as including the following: "accounts, contract rights . . . , general intangibles . . . whether any of the foregoing is owned now or acquired later; all accessions and additions." It filed another financing statement containing similar asset classes and their proceeds.

24. The obligations of the Debtor under the KTC Notes may be guaranteed, in part, by the United States Department of Agriculture, acting through the Office of Rural Development ("USDA").

25. The Debtor and KTC restructured the KTC Loans in 2016.

### 2. United States Department of Agriculture, Acting Through the Office of Rural Development

26. Based on a review of relevant documents, it is my understanding that USDA claims to be a creditor of the Debtor by virtue of the Debtor's execution and delivery of several promissory notes memorializing term loans (the "USDA Loans") in the original aggregate principal amount of $13.7 million. According to the Debtor's books and records, as of September 9, 2019, the outstanding principal balance on the USDA Loans was $10,826,720.39.

27. USDA may claim a mortgage interest in the Debtor's property located at 24 Hospital Lane as well as other real estate located on Hospital Lane and which may not have a street number (the "USDA Mortgage").

28. It is my understanding that USDA has filed a financing statement with the Maine Secretary of State's Office naming the Debtor as its debtor and describing its alleged collateral as including the following: "All contract rights, accounts, general intangibles, gross receipts, pledges, income, and revenue now or hereafter in existence, including the proceeds thereof."

29. The Debtor and USDA restructured the USDA Loans in 2016.

### 3. First National Bank (formerly The First, N.A.)

30. Based on a review of relevant documents, it is my understanding that First National Bank, formerly The First, N.A. ("First National"), claims to be a creditor of the Debtor by virtue of the Debtor's execution and delivery of a revolving line of credit note (the "LOC") with a

maximum original principal amount of $1 million. According to the Debtor's books and records, as of the Petition Date, 2019, the outstanding principal balance on the LOC was $1 million.

31. It is also my understanding that First National claims to be a creditor of the Debtor by virtue of the Debtor's execution and delivery of a promissory note in the original principal amount of $600,000.00 (the "Term Note"). According to the Debtor's books and records, as of September 9, 2019, the outstanding principal balance on the Term Note was **$463,912.86**.

32. It is my understanding that First National has filed a financing statement naming the Debtor as its debtor and describing its alleged collateral as including the following: CRH as its debtor and describing its alleged collateral as including the following: "[a]ccounts . . . and [g]eneral [i]ntangibles, whether any of the foregoing is owned now or acquired later" and proceeds of the same.

33. It is also my understanding that First National claims a perfected security interest in a marketable securities account of the Debtor located at First National Wealth Management with an account number ending with the last four digits of 0795. The market value of this account was $1,595,084.52 as of July 31, 2019.

### 4. Maine Health And Higher Educational Facilities Authority

34. In 1992, the Debtor borrowed approximately $889,000 from the Maine Health and Higher Educational Facilities Authority ("MHHEFA"). This loan was secured by a mortgage on certain property of the Debtor. The Debtor has repaid this loan but the mortgage has not been discharged. The Debtor does not believe that MHHEFA is a creditor in this case.

### 5. Capital Leases

35. There are numerous parties who have filed financing statements with respect to transactions that may be leases or may be disguised financing. None of these parties claim

accounts receivable, cash, or related liquid assets as original collateral. The Debtor reserves all rights as to the proper characterization of such transactions.

### 6. Other Encumbrances

36. There are additional encumbrances recorded in the Washington County Registry of Deeds with respect to the Debtor's real estate. I do not believe they represent current obligations of the Debtor. These include two mortgages in favor of USDA acting through the Farmers Home Administration. These two mortgages may have been paid.

## D. Significant Unsecured Obligations

37. Below is a description of significant unsecured claims against the Debtor. This description is based on a preliminary investigation only. The Debtor, as debtor and debtor-in-possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

### 1. State of Maine - Medicaid

38. The Debtor is a critical access hospital that is paid on a prospective interim basis by the State of Maine's Department of Health and Human Services ("DHHS") for services provided to patients who receive health coverage under the Medicaid program. The Debtor completes annual cost reports that are used to establish whether the Debtor has been under- or overpaid for a specific year. Reconciliations are based on annual amounts paid to the Debtor following the submission of cost reports for specific years.

39. One June 12, 2019, the Debtor received a "Cost Settlement" letter from DHHS accepting the Debtor's identification of an overpayment in the amount of **$1,110,084.00** for 2018 and advising the Debtor that DHHS would withhold claims payments to repay the overpayment if an acceptable repayment plan had not been reached.

9

40. Notes to the Debtor's audited financial statements for the years ending December 31, 2018, and 2017 reflect a payable to the Medicaid program in the amount of $743,838.00 for 2017. Notes to the Debtor's audited financial statements for the years ending December 31, 2017, and 2016 reflect a payable to the Medicaid program in the amount of $1,143,227.00 for 2016. A portion of these amounts is still outstanding.

41. DHHS overpaid the Debtor in 2013, 2014, and 2015, but it is my understanding that these amounts have been paid in full by December 31, 2018.

42. In the absence of currently outstanding overpayments, the Debtor's weekly prospective interim payments (each a "PIP" and collectively "PIPs") from DHHS would be $67,859.00. It is my understanding that DHHS is currently withholding $5,367.00 of this amount from each weekly PIP for application to prior year overpayments. This is contributing to cash availability challenges. This deduction is currently reflected as a disbursement in the Debtor's Cash Plan (as that term is defined below).

## 2. Centers for Medicare and Medicaid Services - Medicare

43. Shortly before the Petition Date, the Debtor determined that it had been overpaid by the Medicare program, which is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), in the approximate amount of **$182,000.00**. The Debtor disclosed this to National Government Services, a third-party fiscal intermediary that assists CMS with administration of the Medicare program. The Debtor proposed a repayment agreement of thirty-five (35) months at 10.62% interest. These are standard terms available in this context. This agreement was not finalized pre-petition.

44. The Debtor's 2018 Medicare cost report reflected that the Debtor had been underpaid by Medicare and was owed **$611,818.00**. The Debtor has received a portion of this

amount, approximately **$371,479.00**, as a tentative settlement and expects additional funds once a final settlement has been received. Any future payment to be received is not included in the Debtor's Cash Plan (as that term is defined below).

### 3. Anthem Health Plans of Maine, Inc.

45. The Debtor has a contract with Anthem Health Plans of Maine, Inc. ("Anthem") to provide medical services to individuals who have health insurance provided by Anthem. The Debtor's books and records reflected that Anthem had underpaid the Debtor by approximately **$327,976.00** in 2017, but that Anthem had overpaid the Debtor by approximately **$689,600.00** in 2018. Pre-petition, Anthem was withholding **$20,000.00** from each weekly disbursement to the Debtor.

### 4. Trade Payables

46. The Debtor has significant unpaid obligations to many of its vendors. The Debtor's books and records reflect that the total amount of unpaid trade payables totals approximately **$3,237,000.00** (as of August 29, 2019). This amount does not include health claims of employees.

### 5. Employee Health Claims

47. The Debtor provides its employees health coverage through a self-funded health plan (the "Health Plan"). The Debtor is the plan administrator. Claims are administered by UltraBenefits, Inc. ("UltraBenefits"). In the ordinary course of business, UltraBenefits receives claims submitted by employees or their health providers, reviews those claims for payment under the terms of the Health Plan, and then provides the Debtor with weekly reports of claims for payment.

48. As of September 3, 2019, known unpaid pre-petition claims under the Health Plan totaled **$451,445.42**.

**III.   The Necessity For Filing**

49.     The Debtor's bankruptcy was necessary for several reasons, in addition to those discussed above. First, many rural hospital patients often have no commercial insurance or are underinsured and use emergency room services in lieu of primary care providers. The Debtor is required to treat these patients, often with no reimbursement or pay in return. Second, Medicare and Medicaid reimbursement margins have fallen in recent years, so even reimbursement through these channels has resulted in reduced income. Third, the Debtor is generally not paying all of its debts as they become due because it lacks the ability to do so. Fourth, the Debtor has many vendors who may be owed money as of this filing, and negotiating with a large body of creditors outside of chapter 11 is difficult, if not impossible.

50.     The Debtor desires to propose and confirm a plan to restructure its balance sheet while also implementing further operational changes to boost earnings. I do not believe that it is possible to restructure the Debtor's obligations effectively outside of chapter 11.

51.     Health care services provided by the Debtor are critical not only to Calais, but also to all of the people living in and visiting the Service Area. The Debtor's closure could lead to worse patient health outcomes for some patients.

52.     The Debtor's goal in filing for bankruptcy is to position the company to be able to stay open, continue providing services to the Service Area, and make further operational changes to ensure the delivery of high-quality services. If the Debtor is unable to successfully navigate restructuring, it may be forced to close. Such a closure would significantly and negatively impact Calais and the entire Service Area.

**IV.** **The First Day Motions**

53. I have reviewed each of the First Day Motions, including related exhibits, and believe that the relief sought in each of the First Day Motions is necessary to avoid irreparable harm to the Debtor and are necessary to successfully exit from chapter 11 protection. A failure to grant them would likely lead to cessation of business operations or a forced liquidation in state court. The Debtor does not consent to conversion of this case to one under chapter 7.

**A.** **The Cash Collateral Motion**

54. Capitalized terms not defined herein and used during the following discussion of the Cash Collateral Motion shall have the meaning ascribed to them in the Cash Collateral Motion.

55. Without access to the use of Cash Collateral in chapter 11, the Debtor would be unable to pay its general operating expenses immediately, including, without limitation, employee payroll and other benefits, payments for necessary medical supplies, and for the various other items reflected in the Cash Plan. Upon the Debtor's inability to pay these expenses, it would have to immediately cease operations, which would result in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's creditors. The human cost of such a closure would also be significant and adverse health consequences to patients in the Service Area are likely.

56. I believe that the proposed disbursements that the Debtor seeks to make between the Petition Date and the date of a final hearing on the Cash Collateral Motion are reasonable and necessary to maintain medical operations and avoid irreparable harm to the Debtor. I also believe that the Debtor would suffer irreparable harm if it is unable to use its Cash Collateral until the date of a final hearing on the relief requested in the Cash Collateral Motion.

57. I further believe that each of the disbursements in the Cash Plan is reasonable and necessary in order to continue the provision of appropriate health care services to the patients of

the Debtor without harming the value of the Debtor as a going concern and for the Debtor to fulfill its obligations while in chapter 11 throughout the Relevant Period. The proposed disbursements may vary from actual disbursements as medical supply needs vary from week to week. Receipts may also vary based on patient volume.

58. In addition, the Debtor requires use of its Cash Collateral to have adequate time to formulate and propose a chapter 11 plan of reorganization.

59. I believe that the allegations in the following paragraphs of the Cash Collateral Motion are true and accurate to the best of my knowledge and belief: 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21.

B.  **The Payroll Motion**

60. Capitalized terms not defined herein and used during the following discussion of the Payroll Motion shall have the meaning ascribed to them in the Payroll Motion.

61. I understand that by the Payroll Motion, the Debtor seeks authorization to pay certain accrued wages, salaries, and payroll-related expenses, to make payments to certain insurance companies, and to authorize all applicable banks or financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts in relation to amounts authorized to be paid under the Payroll Motion.

62. I believe any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with Employees, cause irreparable harm to morale, and harm the value of the Debtor's business, property, and assets. As a medical facility, the Debtor's operations require skilled, carefully trained, and often highly educated employees to maintain the requisite levels of medical care and other services provided to patients. Given the Debtor's location in Calais, Maine, the Debtor expends significant effort and cost training and

14

retaining its current employees and recruiting medical providers. If Employees were to terminate their employment with the Debtor because they are not promptly paid and benefit programs are not maintained, then it would be difficult to find replacement employees. The Employees' skills, knowledge, and understanding of the Debtor's business and operations are essential to the effective operation of the Debtor's business, including delivery of high quality medical care to patients, and to a successful reorganization of this business in a fashion that maximizes the return to creditors and other parties-in-interest.

63. To maintain and preserve the morale of any continuing labor force while restructuring occurs, I believe that it is essential that the Debtor be permitted to pay Employees the compensation and deductions accrued prior to the Petition Date and that Employees be permitted to utilize PTO in the manner requested in the Payroll Motion. I believe that if the Debtor reduces or eliminates these benefits, then the likelihood of losing Employees increases.

64. Absent the relief requested in the Payroll Motion, I believe that the Debtor's Employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. I believe that many Employees would seek other employment if not paid and that the Debtor could lose critical Employees who would be difficult to replace. I believe that the loss of these Employees would jeopardize the Debtor's continuing business operations and its ability to reorganize. Moreover, I understand that applicable state law may require payment of wage-related claims upon the termination of such Employees.

65. I believe the factual allegations in the following paragraphs of the Payroll Motion are true and accurate to the best of my knowledge and belief: 7-28 and 30-43.

C. **The Cash Management Motion**

66. Capitalized terms not defined herein and used during the following discussion of the Cash Management Motion shall have the meaning ascribed to them in the Cash Management Motion.

67. I understand that by the Cash Management Motion the Debtor seeks authority to continue its pre-petition cash management system (the "Cash Management System") and to use pre-petition bank accounts and business forms. The Debtor also seeks authority to continue to use any pre-petition debit and credit cards it may have as well as permission to use electronic funds transfers and automatic clearinghouse transactions for purchases with vendors. I believe this relief is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor. The Cash Management System includes several accounts located at several different banks and investment accounts described in **Exhibit A** to the Cash Management Motion. It is my understanding that opening new bank accounts could cause significant delays in the Debtor's receipt of electronic payments, which is the predominate form of payment to the Debtor from its payors. This would cause irreparable harm to the Debtor due to the fact that, absent continued payments on the current schedule, the Debtor would lack sufficient funds to maintain operations.

68. The Debtor also uses a variety of business forms. The Debtor requests permission to use its existing business forms, such as checks that it prints on stock. The Debtor will identify its status as a debtor-in-possession on all checks, to the extent that it is required to do so.

69. The Debtor has a complex accounting system that is tailored to its business needs. Opening new books would be disruptive to accounting functions. The Debtor's accounting system is capable of delineating between pre- and post-petition transactions.

70. I believe that changing the Cash Management System would result in needless disruption of the Debtor's business and impede the Debtor's ability to seamlessly transition into chapter 11.

71. I believe the factual allegations in the following paragraphs of the Cash Management Motion are true and correct to the best of my knowledge and belief: 7, 8, 9, 10, 11, 15, 16, and 17.

### D. The Need For Emergency Hearings

72. Due to the nature of the relief sought by certain of the First Day Motions, the Debtor seeks expedited or emergency hearings on them, as appropriate in light of the relief requested and the Court's availability, as soon as possible after the Petition Date.

73. The Debtor seeks immediate relief with respect to the Cash Collateral Motion. Without immediate authority to continue to use Cash Collateral, the Debtor will be unable to operate its business going forward. The ability to operate its business is essential to the Debtor's ability to preserve value as a going concern—and to keep patients in the Service Area safe and healthy. Without the ability to use Cash Collateral, the Debtor would be unable to buy basic medical supplies necessary to keep patients healthy or to pay payroll. The Debtor would simply be unable to operate. This would jeopardize the Debtor's reorganization.

74. The Debtor's ability to continue its operations depends, to a significant extent, on its ability to retain its Employees. If the Payroll Motion is not heard on an expedited or emergency basis, then the Debtor will not be able to pay its Employees in an ordinary and timely manner. That inability would almost certainly lead to a loss of employees at the time when the Debtor needs them most. This would jeopardize the Debtor's continuing business operations and ability to reorganize.

75. The Debtor also seeks immediate authority to maintain its existing Cash Management System, bank accounts, and business forms in order to make a seamless transition into chapter 11 and avoid disruptions in receipt of revenue. The Debtor relies upon its existing Cash Management System for important business functions, including the payment of payroll and applicable state and federal payroll taxes and lacks meaningful cash reserves to withstand a protracted lapse in payment should that arise.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2019

_____, CEO
Rodney Boula