**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| | ) |
| **In re:** | ) |
| | ) |
| **CALAIS REGIONAL HOSPITAL,** | )       **Chapter 11** |
| | )       **Case No. 19-10486** |
| **Debtor.** | ) |
| | ) |

**DISCLOSURE STATEMENT WITH RESPECT TO THE CHAPTER 11 PLAN FOR
CALAIS REGIONAL HOSPITAL PREPARED BY THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND KATAHDIN TRUST
COMPANY DATED FEBRUARY 19, 2021**

*/s/ Jeremy R. Fischer*
Jeremy R. Fischer
Kellie W. Fisher
**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
Telephone: (207) 772-1941
E-mail: jfischer@dwmlaw.com
          kfisher@dwmlaw.com

*Counsel to the Official Committee of Unsecured
Creditors*

-and-

*/s/ Roger A. Clement, Jr.*
Roger A. Clement, Jr.
**VERRILL DANA LLP**
One Portland Square Portland, ME 04101-4054
Telephone: (207) 774-4000
E-mail: rclement@verrill-law.com

*Counsel to Katahdin Trust Company*

# I.
## INTRODUCTION

The Official Committee of Unsecured Creditors (the "Committee") and Katahdin Trust Company ("KTC," and together with the Committee, the "Plan Proponents") provide this Disclosure Statement to you and all known creditors of Calais Regional Hospital (the "Debtor") to describe their proposed Plan[1] to address the assets and liabilities of the Debtor and distribute proceeds to creditors. In short, the purpose of this Disclosure Statement is to clearly and succinctly inform you about (1) what you are likely to receive under the Plan, (2) when you are likely to receive it, and (3) what contingencies there are to the distributions.

The Plan Proponents believe that this Disclosure Statement provides you with adequate information to make an informed decision about voting on the Plan. Below you will find information about: (1) the Debtor's operating and financial history; (2) the events leading to the Debtor's bankruptcy filing; (3) significant events that have occurred during the bankruptcy case; (4) the Debtor's assets and liabilities; (5) how creditors' claims are classified and treated by the Plan; (6) certain effects of confirmation of the Plan; (7) certain risk factors associated with the Plan; (8) potential alternatives to the Plan; and (9) the confirmation process and the voting procedures related to the Plan.

A copy of the Plan and related documents was filed contemporaneously herewith. THIS DISCLOSURE STATEMENT MERELY SUMMARIZES THE PLAN. FOR A DEFINITIVE UNDERSTANDING OF THE TERMS OF THE PLAN, PLEASE REVIEW THE PLAN ITSELF. IF THERE IS ANY DISCREPANCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE PROVISIONS OF THE PLAN WILL CONTROL.

This Disclosure Statement is being provided to you in connection with the Plan Proponents' solicitation of votes on the Plan. Your rights may be affected by the Plan, so you should carefully read the Plan and this Disclosure Statement and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult with one. A ballot for your use in voting to accept or reject the Plan is enclosed. Instructions for completing and returning the ballot are printed on the ballot itself. IN ORDER FOR YOUR BALLOT TO COUNT, IT MUST BE RECEIVED AT THE ADDRESS STATED ON THE BALLOT NO LATER THAN 5:00 P.M. (EASTERN TIME) ON _____, 2021.

The United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court") will consider approval of this Disclosure Statement, and make a determination as to whether it contains adequate information to allow you to make an informed vote on the Plan. HOWEVER, APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION ABOUT THE MERITS OF THE PLAN. Rather, the Bankruptcy Court will hold a hearing on confirmation of the Plan on _____, **2021** before the Honorable Michael A. Fagone at 202 Harlow Street, Bangor, Maine. At the confirmation hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for

---

[1]   Capitalized terms not otherwise specifically defined in this Disclosure Statement shall have the meaning attributed to them in the Plan. Each definition in this Disclosure Statement is intended to include both the singular and plural. Headings are for convenience or reference only and shall not affect the meaning or interpretation of this Disclosure Statement.

confirmation under the Bankruptcy Code.  Objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before _____, 2021.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the hearing.

## II.
## DESCRIPTION OF THE DEBTOR'S BUSINESS AND
## EVENTS LEADING TO THE CHAPTER 11 FILING

### A.    The Debtor's Business

The Debtor is a Maine non-profit business corporation located in Calais, Maine. It was incorporated in 1917 and has a mission "to provide and plan patient care, educational and restorative services that meet our customers' expectations, commensurate with available resources."

The Debtor operates a 25-bed general medical and surgical hospital in Calais, with approximately 259 employees and approximately 216 full-time equivalent positions.  The Debtor services patients in eastern Washington County, Maine, and also provides services to some Canadian patients.

The Debtor provides the following services, among others, to patients in its service area: (a) inpatient services including end-of-life care, nursing care to support transitions to home ("swing bed" care), and hospitalist services to coordinate inpatient care; (b) outpatient services including cardiology testing, emergency department services, lab testing, and outpatient medical procedures (e.g., blood transfusions, injections, wound care); (c) a range of imaging services including CT scanning, mammography, MRI, and ultrasound; (d) therapy rehabilitation services including alternative pain management, occupational therapy, physical therapy, speech therapy; (e) limited general surgical services (and providing an operating room to visiting specialists); (f) primary care services; (g) numerous types of specialty care primarily provided by physicians utilizing the Debtor's facilities; and (h) support for community groups.

In 2018, there were a total of 38,013 inpatient, swing unit, emergency department, and outpatient visits and a total of 652,988 patient procedures performed.
.
The Debtor provides the majority of its services at its hospital campus, which is located at 24 Hospital Lane, Calais, Maine. It also operates primary care physician practices at other locations. The Debtor operates several physician practices at 37 Palmer Street, Calais, Maine, including CRMS Family Medicine, CRMS Internal Medicine, CRMS Pediatrics, and CRMS Pulmonology. The Debtor operates several physician practices at 15 Palmer Street, Calais, Maine, including CRMS Surgical Services and CRMS Orthopedics.  The Debtor also provides services through CRMS Baileyville at a location on Washington Street, Baileyville, Maine.  The Debtor also has a non-debtor affiliate that provides home health care.  This company is named Calais Regional Health Services ("CRHS").

By virtue of the Debtor's rural location, size, and certain services that it provides, it qualifies as and is a critical access hospital under the Medicare and Medicaid programs. Congress created the critical access hospital designation in 1997 in order to reduce the financial vulnerability of rural hospitals while also ensuring that essential health services are available to rural communities. To meet the designation criteria, a hospital must not be closely located to another nearby hospital, must maintain no more than 25 inpatient beds, and must have 24-hour emergency services. The Debtor meets these criteria.

## B.    Events Leading to the Debtor's Chapter 11 Filing

The Debtor faced years of losses from its operations and, upon information and belief, has not been profitable for several years. For instance, as set forth in the Debtor's Monthly Operating Report for the period of December 1, 2019 through December 31, 2019, [2] in 2018, the Debtor had operating losses of $687,581. In 2018, the value of the Debtor's net assets also declined by $574,582. At the time that it filed for bankruptcy relief, the Debtor stated that it faced cash shortfalls that required it to reorganize its financial affairs in bankruptcy.

### III.
### THE CHAPTER 11 CASE

## A.    The Bankruptcy Filing and Retention of Professional Advisors

On September 17, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Case is administered under case number 19-10486 and has been overseen by the Honorable Michael A. Fagone.

Since the Petition Date, the Debtor has remained in possession of its assets, including, but not limited to its real estate, inventory, equipment, and cash, and managed its business as a debtor-in-possession. No trustee has been appointed in this Case. However, on October 24, 2019, the United States Trustee appointed the following creditors to serve on the Committee: (i) Blue Water Emergency Partners of Calais; (ii) Navix Diagnostix, Inc.; and (iii) Maine State Nurses Association/National Nurses Organizing Committee/ National Nurses United. On January 4, 2021, the United States Trustee also appointed Comprehensive Pharmacy Services, LLC to the Committee.

The Debtor, with Bankruptcy Court approval, retained Murray, Plumb and Murray as its legal counsel and Spinglass Management Group, LLC as its financial advisor. The Debtor has also retained Pierce Atwood, LLP as special counsel, Kelly, Remmel & Zimmerman as special counsel, Norman Hanson & Detroy as special counsel, Berry Dunn McNeil & Parker LLC as accountants for the Debtor, and Ankura Consulting, LLC as a valuation professional. The Committee has retained Drummond Woodsum as its counsel.

---

[2] The Debtor's monthly operating reports are publicly available and filed on the docket of the Case at docket entries 113, 191, 227, 281, 292, 298, 342, 350, 381, 410, 452, 466, 488, 496, 508, and 530, and can be emailed to any party that requests a copy upon request. Any party that would like copies of the monthly operating reports is encouraged to contact Jeremy R. Fischer, counsel to the Committee, at jfischer@dwmlaw.com.

**B.**     **The Debtor's Financial Performance in Bankruptcy**

Since the Petition Date, the Debtor has continued its hospital operations.  Each month, the Debtor has prepared and filed "monthly operating reports" which describe, among other things, its cash receipts and disbursements, its balance sheet of assets and liabilities, and its accounts payable and receivable for the prior calendar month.  Between the Petition Date and October 31, 2020, the Debtor reports that it has earned $25,015,720 of "Net Patient Revenue" from its hospital operations.  During that same period, the Debtor has incurred total operating expenses of $29,037,580.  Thus, since the Petition Date through October 31, 2020, the Debtor's operations have yielded losses of at least $4,021,860.

However, with the onset of the COVID-19 pandemic, the federal government provided substantial stimulus payments to healthcare providers, including rural, critical access hospitals like the Debtor.  As of October 31, 2020, the Debtor had received $4,627,317 in federal stimulus payments and recognized most of these payments as "other operating revenues" on its financial statements.  Thus, while the Debtor reports "operating gains" of $529,840 between the Petition Date and October 31, 2020, these "gains" are the result of one-time federal stimulus payments related to COVID-19, not hospital operations.  Hospital operations have actually resulted in substantial losses for the Debtor and its bankruptcy estate, consistent with the Debtor's financial performance in the years leading to bankruptcy.

Another contributing factor related to the Debtor's financial difficulties has been certain significant costs incurred solely as a result of its status as a chapter 11 debtor, including payments to certain professional advisors, payments to Ankura Consulting LLC for a valuation, and quarterly statutory fees paid to the United States Trustee Program under 28 U.S.C. § 1930.  These payments from the Petition Date through December 24, 2020 are summarized as follows:

| | |
|---|---|
| Murray, Plumb & Murray (Debtor's bankruptcy counsel) | $384,596.50 |
| Spinglass Management Group, LLC (Debtor's bankruptcy financial advisor) | $95,258.45 |
| Drummond Woodsum (Committee's bankruptcy counsel) | $79,046.40 |
| United States Trustee Program Fees (28 U.S.C. § 1930) | $261,989 |

The Plan Proponents understand that the Debtor is currently anticipating certain reconciliation payments in the near future from Centers for Medicare and Medicaid Services ("CMS") in the estimated amount of $1,000,000 to $1,200,000 and the Office of MaineCare Services in the estimated amount of $600,000 to $700,000.  Additionally, if the Plan is confirmed and the Effective Date occurs prior to March 31, 2021, the Plan Officer and Purchaser intend to apply for a Paycheck Protection Program ("PPP") loan, which may unlock substantial value for the Estate.

**C.**    **The Debtor's Litigation with Anthem and the U.S. Small Business Administration**

During its bankruptcy case, the Debtor's primary activities have been navigating the additional financial distress caused by the COVID-19 pandemic (described above) and engaging in unsuccessful and costly litigation.

First, on November 14, 2019, the Debtor filed a complaint against Anthem Health Plans of Maine, Inc. ("Anthem").  The complaint asserted claims for avoidance and recovery of allegedly fraudulent transfers received by Anthem (Counts I-V), disallowance of Anthem's claims in the Case (Count VI), and declaratory relief related to Anthem's right to recoupment under its provider agreement with the Debtor (Count VII).  The premise of the Debtor's fraudulent transfer claims was that the Debtor did not receive reimbursement from Anthem that was reasonably equivalent to the value of the services provided by the Debtor to Anthem's members, and, therefore, the Debtor was entitled to, among other things, money damages and disallowance of Anthem's claims in bankruptcy.  On December 9, 2019, Anthem filed a motion to dismiss, to which the Debtor objected on January 14, 2020.  Following oral argument, the Bankruptcy Court entered an order dismissing Counts I-VI on March 4, 2020.  The litigation now remains ongoing only with respect to Anthem's right to recoupment (Count VII).

Second, on April 27, 2020, the Debtor filed a complaint (Adv. Proc. No. 20-1005 consolidated with Adv. Proc. No. 20-1006 against the Administrator of the U.S. Small Business Administration (the "SBA").  The complaint seeks declaratory judgment and an injunction against the SBA in an effort to receive a fully forgivable federal PPP loan in the sum of $1,835,267.  The PPP was enacted by Congress in response to the COVID-19 pandemic to provide financial support for small businesses that did not lay off employees.  However, the SBA determined that debtors in bankruptcy ineligible for PPP loans.  The Debtor alleges that the SBA's decision unlawfully discriminated against the Debtor based on its status as a debtor in bankruptcy and further, was "arbitrary and capricious."  After expedited briefing and trial, on June 3, 2020, the Bankruptcy Court ruled in favor of the SBA.  This ruling was ratified in part by the U.S. District Court for the District of Maine on July 31, 2020 but remanded for further Findings. Judge Fagone issued Additional Proposed Findings and Conclusions upholding the exclusion of Debtors from PPP eligibility on January 12, 2021 that will be reviewed again by the U.S. District Court for the District of Maine.  The Debtor has not received PPP funds and is unlikely to receive PPP while it is actively in bankruptcy.

**IV.**
**THE DEBTOR'S ASSETS AND LIABILITIES**

**A.**    **The Debtor's Assets**

In general terms, the Debtor's primary assets are: (1) real estate; (2) inventory; (3) equipment; (4) accounts receivable, including private (such as Anthem) and public payors (such as the state and federal Medicaid program and the federal Medicare program); (5) cash and deposit accounts; (6) investment property; and (7) other assets, including investment property and general intangibles.  As of the Petition Date, the Debtor reported total assets with a total value of $14,194,802.23, broken down as follows:

6

| Real Estate | $6,900,200.00 |
| Inventory | $498,579.52 |
| Equipment | $209,248.00 |
| Accounts Receivable (net of doubtful or uncollectible amounts) | $2,976,0789.00 |
| Cash, Deposit Accounts, and Prepayments | $1,406,409.73 |
| Investment Property | $1,595,085.00 |
| Other Assets | $609,200.98 |

In its September 30, 2020 monthly operating report, the Debtor estimated the total value of its assets at $20,048,138. The Debtor categorizes these assets into three separate groups: (1) current assets; (2) board designated assets; and (3) other assets. The Debtor's current assets, which include items such as cash ($3.43 million), accounts receivable ($3.53 million), and inventory ($431,460), have a total value of $7,694,213. The Board designated assets, which include investments and a debt service reserve account, have a total value of $1,117,817. Finally, the Debtor's other assets, including real estate and equipment, have a value of $11,236,109. As of September 30, 2020, the Debtor also had endowments and special purpose funds of $1,734,027. The Debtor does not include this amount in its total asset value because it reports a corresponding liability related to this amount, resulting in a net value of $0.

**B.**    **The Debtor's Liabilities**

As of the Petition Date, the Debtor reported total liabilities of $20,174,230.50. These liabilities include: (1) claims secured by liens on the Debtor's assets ($15,929,899.53); (2) unsecured claims with priority under the Bankruptcy Code, such as taxes and wages ($7,352.18); and (3) general unsecured claims ($4,236,978.79). These liabilities are described in more detail as follows:

**1.**    **KTC Loans**

On August 2, 2006, KTC made a loan to the Debtor in the amount of $5,000,000.00 (the "KTC Loans"). In connection with the KTC Loans, the Debtor executed and delivered certain promissory notes to KTC, which are now held by KTC and the United States Department of Agriculture, Office of Rural Development ("USDA"). In connection with the KTC Loans, the Debtor granted a mortgage on the real estate where the hospital is located (24 Hospital Lane in Calais) and a lien on all business assets owned by the Debtor. KTC recorded the mortgage in the Washington County Registry of Deeds and filed a financing statement with the Maine Office of the Secretary of State. As of September 9, 2019, the outstanding principal balance on the KTC Loans was $3,639,344.60. KTC's claim is described in greater detail in Proof of Claim 89, as may

be amended. As described below, the Plan Proponents have negotiated with KTC and USDA and reached an agreement on the treatment of the KTC Loans in the Plan.

## 2.   USDA Loans

On August 9, 2006, USDA made a loan to the Debtor in the amount of $13.7 million (the "USDA Loans"). In connection with the USDA Loans, the Debtor executed and delivered certain promissory notes to USDA, which are now held by USDA. In connection with the USDA Loans, the Debtor granted a mortgage on the real estate where the hospital is located (24 Hospital Lane in Calais) and a lien on all business assets owned by the Debtor. USDA recorded the mortgage in the Washington County Registry of Deeds and filed a financing statement with the Maine Office of the Secretary of State. As of September 9, 2019, the outstanding principal balance on the KTC Loans was $10,826,720.39. USDA's claim is described in greater detail in Proof of Claims 89 and 100, as may be amended. As described below, the Plan Proponents have negotiated with USDA and reached an agreement on the treatment of the USDA Loans in the Plan.

## 3.   First National Loans

On March 16, 2007, First National Bank, formerly The First, N.A. ("First National"), made a loan to the Debtor in the amount of $600,000, and the Debtor executed and delivered a promissory note to First National. On May 11, 2011, First National granted the Debtor a credit line in the maximum principal amount of $1 million, and the Debtor executed and delivered a promissory note to First National (collectively, the "First National Loans"). In connection with the First National Loans, the Debtor pledged an investment account to First National. First National filed a financing statement with the Maine Office of the Secretary of State. As of September 9, 2019, the outstanding principal balance on the First National Loans was $1,463,912.86, and the value of the pledged investment account was $1,595,084.52. Subsequently, during the Debtor's bankruptcy case, the pledged investment account was converted into cash and deposited into a pledged bank account at First National.

## 4.   Unsecured Claims

As noted above, as of the Petition Date, the Debtor reported $4,244,330.97 of unsecured debt. The largest unsecured creditors include several members of the Committee (Blue Water Emergency Partners of Calais - $335,336.64 and Navix Diagnostix, Inc. - $64,415.61), as well as Anthem ($512,429.72), Quorum Health Resources, Inc. ($443,579.37), Zimmer US Inc. ($243,725.36), and CPS, Inc. ($218,085.88).

As of September 30, 2020, the Debtor reports total liabilities of $20,048,137, as set forth in the Debtor's September monthly operating report. The Debtor divides its liabilities into two categories: (1) current liabilities and (2) other liabilities. The Debtor's "current liabilities" total $12,917,351 and include, among other liabilities, pre-petition accounts payable of $4,365,847, post-petition accounts payable of $428,713, and other payables of $1,836,496. The Debtor's "other liabilities" include long term debt of $14,554,982 and retained earnings of ($7,424,196), for a total of $7,130,786. The Debtor also reports a liability for endowments and special purpose funds in the amount of $1,734,027. As noted above, this liability is offset by a corresponding asset value in the same amount, resulting in a net liability of $0.

8

# V.
## DESCRIPTION OF THE PLAN

As noted in the Introduction above, this Disclosure Statement is merely a summary of the Plan.  You are urged to carefully read the Plan in full.  If the Plan is confirmed by the Bankruptcy Court, the Plan will be binding upon the Debtor, all creditors, and other affected parties, regardless of whether they voted for or against the Plan.

In order for any claim to be paid under the Plan, the Plan must be confirmed by the Bankruptcy Court and must take effect in accordance with its terms.  The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on ____, 2021 at _:___ a.m./p.m..  If the Plan is confirmed on that date, the Plan will take effect on the "Effective Date," as defined in the Plan.  In order for any claim against the Debtor to receive a distribution under the Plan, the claim must be an "Allowed," which means that the claim must be determined to be valid pursuant to procedures established by the Bankruptcy Code, the Bankruptcy Court, and the Plan.  For further information about this issue, please refer to Section V(F) below.

## A.    Means for Executing the Plan

### 1.    Sale of the Debtor's Purchased Assets

Under the Plan, substantially all of the assets of the Debtor (the assets purchased under the terms of the APA (defined below), the "Purchased Assets") will be sold to Calais      Community Hospital (the "Purchaser"), an entity affiliated with Down East Community Hospital, which is located in Machias, Maine.  The terms of the transaction are described in greater detail in the Term Sheet, which is attached to the Plan as Exhibit 1.  The Term Sheet will be converted into an Asset Purchase Agreement (the "APA") over the next short period of time and will be filed with the Bankruptcy Court once final.  Pursuant to the terms of the APA, the Purchaser will pay for the Purchased Assets by paying a portion of the KTC Loans and the USDA Loans through the assumption of debt.  As described below, the Purchaser will execute and deliver a promissory note to USDA as provided for by the terms of the APA.

### 2.    Appointment of the Plan Officer

All the Debtor's assets other than the Purchased Assets – including, subject to the APA, accounts receivable, investment property, refunds and deposits, insurance claims, and potential causes of action (collectively, the "Remaining Assets") – will remain in the Estate and be distributed to the Debtor's creditors by the Plan.  Immediately upon entry of the Bankruptcy Court's order confirming the Plan, Nathanial Hull will be appointed as the Debtor's "Plan Officer." The Plan Officer will be vested with all powers and interests of the Debtor and the Estate.  The Plan Officer will be responsible for (i) entering into a management agreement with the Purchaser upon confirmation of the Plan upon which the Purchaser shall immediately start managing the Debtor and (ii) implementing the APA and the Plan, including: (a) signing the APA on behalf of the Estate; (b) undertaking all actions to comply with the APA; (c) controlling and distributing the Remaining Assets; and (d) objecting to any disputed claims.

### 3. Establishment of the Liquidating Trust and Appointment of the Liquidating Trustee

To satisfy Allowed Class Six claims (allowed general unsecured claims), the Plan will establish a Liquidating Trust for their exclusive benefit. Jeffrey T. Piampiano will serve as the Liquidating Trustee. Mr. Piampiano is a chapter 7 trustee in the District of Maine who is well qualified to administer the Liquidating Trust and is experienced in pursuing the types of causes of action that will be assigned to the Liquidating Trust. On the Effective Date, the Plan Officer will transfer $653,747 to the Liquidating Trust and assign all the Debtor's right, title, and interest in certain claims and causes of action to the Liquidating Trust. The Liquidating Trustee will be responsible for controlling the Liquidating Trust's assets, investigating and prosecuting the causes of action, and distributing the Liquidating Trust's assets to the holders of Allowed Class Six claims.

The claims and causes of action assigned to the Liquidating Trust will include claims for commercial tort claims and "avoidance actions" under chapter 5 of the Bankruptcy Code. At this time, the Plan Proponents have not had an opportunity to investigate the existence of any commercial tort claims, but these claims could include claims for breaches of fiduciary duty owed by any person (including the Debtor's current or former officers and directors) to the Debtor. Similarly, the Plan Proponents do not yet have information about the existence of any "fraudulent transfer" claims under state law or the Bankruptcy Code, but such claims would exist if the Debtor transferred any assets with actual intent to hinder delay or defraud creditors, or for less than reasonably equivalent value, during 2-6 years prior to the Petition Date and while the Debtor was in a compromised financial condition (e.g., the Debtor was insolvent or had unreasonably small capital to continue its operations).

However, according to information provided by the Debtor, the Plan Proponents do have some information about so-called "preference" claims, which are avoidable under § 547(b) of the Bankruptcy Code. Potential preference claims exist related to each payment that the Debtor made on any existing debts within 90 days of the Petition Date that allowed the creditor to receive more than it would have received in a chapter 7 liquidation case. According to information provided by the Debtor, the face amount of these potential claims is $2.2 million. Preference claims are subject to certain defenses under Bankruptcy Code § 547(c), such whether the payment was made in the ordinary course of business, or when the creditor provided something of value to the Debtor after the payment was received. Based on the Plan Proponents' experience, after application of defenses and payment of the costs of collection, the Plan Proponents estimate that the Liquidating Trustee is likely to recover 10%-25% of the face value of the preference claims, although higher or lower recoveries are possible. The Plan Proponents anticipate that the Liquidating Trustee can recover these amounts after settlement or litigation in 12-18 months of the Effective Date.

### B. Classification of Claims

Other than Unclassified Claims, the Plan divides all claims into classes, placing all substantially similar claims into the same class. The Plan also proposes to make certain distributions to the holders of all "Allowed" claims in each class in full and final satisfaction of such claims. The Plan proposes the following classes:

- <u>Unclassified Claims</u> are of all "administrative expenses" (including all claims for goods and services provided to the Debtor after the Petition Date) and government tax claims granted priority under § 507(a)(8) of the Bankruptcy Code.
- <u>Class One</u> shall consist of the secured claims related to the KTC Loans and the USDA Loans.
- <u>Class Two</u> shall consist of all secured claims related to the First National Loans.
- <u>Class Three</u> shall consist of miscellaneous claims secured by liens on the Debtor's assets, if any, including any "capital leases" related to equipment used by the Debtor.
- <u>Class Four</u> shall consist of unsecured wage and benefits claims granted priority under § 507(a)(4) and (5)of the Bankruptcy Code.
- <u>Class Five</u> shall consist of all other unsecured claims entitled to priority under § 507(a) of the Bankruptcy Code, other than Unclassified Claims and Class Four Claims.
- <u>Class Six</u> shall consist of all general unsecured claims.

**C.**     **<u>Treatment of Claims</u>**

The Plan proposes the following treatment for each class:

<u>Unclassified Claims</u> are unimpaired and are not entitled to vote on the Plan. Unclassified Claims will be paid in full in cash on the later of (i) the Effective Date or (ii) the date on which such claim becomes Allowed, unless the claimant and the Plan Officer agree to a different treatment.

<u>Class One</u> claims are impaired and entitled to vote on the Plan. Class One claims will be Allowed in the aggregate amount of $14,469,949.79. The Class One claims will be fully and finally satisfied in two ways under the Plan. The Purchaser will execute and deliver a promissory note to USDA in connection with the sale of the Purchased Assets, evidencing the assumption of $2 million of USDA debt, all in accordance with the terms of the APA.

Second, on the Effective Date, the Plan Officer will make an initial distribution of the Debtor's cash of (i) $450,000 to satisfy the KTC Secured Claim and (ii) $1,500,000 to the USDA in partial satisfaction of the USDA Secured Claim. Such cash shall include, but shall not be limited to, all funds held in the Debtor's reserve accounts, including any operating accounts and reserve accounts, including any 457B retirement funds and the USDA debt service account. All amounts distributed to USDA up to $3.7 million (some of which may be the proceeds of accounts receivable of the Debtor pledged to the USDA and collected by the Purchaser pursuant to the terms of an account collection agreement to be entered into by and between the Purchaser and the USDA) shall be loaned by USDA to the Purchaser as working capital, and shall be added to the principal amount of the promissory note executed by the Purchaser for the benefit of USDA. Subsequently, after the Effective Date of the Plan, the Plan Officer will distribute any remaining cash held by the Plan Officer to USDA, including the proceeds of the Debtor's accounts receivable. The Plan Officer will make any subsequent distributions to the USDA on a date to be agreed upon by the Plan Officer and the USDA. The Sale Transaction is conditioned on the Purchaser receiving not less than $1.5 million in cash from the USDA as proceeds of the initial distribution.

<u>Class Two</u> Claims are unimpaired and are not entitled to vote on the Plan. Class Two claims will be Allowed in the total amount of $1,470,025.16. In full and final satisfaction of the

Class Two claims, on the Effective Date, First National will be entitled to setoff the Allowed amount against the amounts on deposit in the Debtor's pledged bank account at First National. Any excess funds after setoff will be immediately turned over to the Plan Officer to be distributed to holders of Allowed Class One claims.

Class Three claims are unimpaired and are not entitled to vote on Plan.   Allowed Class Three claims will be fully and finally satisfied in one of two ways.  First, the Purchaser may assume, and the Plan Officer may then assign, any executory contract or lease related any Class Three claim pursuant to the requirements of Bankruptcy Code § 365 in the manner provided for in the APA.  Alternatively, if the executory contract or lease is not assumed by the Purchaser and assigned by the Plan Officer, the Plan Officer will abandon any collateral securing such Class Three claim to the holder of such claim.

Notwithstanding anything in this Plan, a Confirmation Order, or the APA to the contrary, any Medicare Provider Agreements shall not be considered an "asset" that may be sold pursuant to section 363 of the Bankruptcy Code.  As of the Confirmation Date, the Purchaser shall either (i) obtain a new Medicare Provider Agreement for Purchaser or (ii) take an assignment of the Debtor's Medicare Provider Agreement. If the Purchaser intends to accept the Medicare Provider Agreements, then as of the Effective Date, and in accordance with 11 U.S.C. § 365, the Debtor assumes its Medicare Provider Agreement(s), identified by CMS Certification Number(s) xx (, xx and xx), including all benefits and burdens.  As of same date, Purchaser accepts automatic assignment of the Debtor's Medicare Provider Agreement under 42 C.F.R. § 489.18, including all benefits and burdens.  Thereafter, the Medicare provider agreement will be governed exclusively by the Medicare statute, regulations, policies and procedures, and without regard to bankruptcy law.  These include, but are not limited to, adjustment of all payments to the Buyer, as the owner of the Medicare Provider Agreements, to account for all prior overpayments and underpayments, including those relating to the pre-petition and pre-sale periods.

Notwithstanding anything to the contrary in the Confirmation Order, APA, or any exhibits, CMS' right of recoupment and CMS' administration of the Medicare Provider Agreements and federal Medicare laws and regulations, are unaffected by the Sale Transaction, a Confirmation Order, or APA. Nothing in the APA or the Confirmation Order shall be construed or interpreted as a sale of the Medicare Provider Agreement.

Class Four Claims are unimpaired and are not entitled to vote on the Plan.  Class Four Claims include Prepetition Claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay and certain benefits as described in §§ 507(a)(4) and (5) of the Bankruptcy Code.  Priority Wage Claims are limited in amount to **$13,650.00** per individual.  On September 17, 2019, the Debtor filed that certain *Motion For Authority To Pay Pre-Petition Wages And For Related Relief* [Dkt. No. 13] (the "Payroll Motion").  Pursuant to the Order granting the Payroll Motion [Dkt. No. 41] (the "Payroll Order"), the Debtor paid certain priority wage claims and maintained Prepetition employee benefit programs subject to the terms and conditions of the Payroll Order.

Priority Wage Claims shall be satisfied in accordance with the policies of the Debtor that existed as of the Petition Date, subject to the terms of the Payroll Order.  Pursuant to the Payroll Order, earned paid time off shall be utilized by employees of the Debtor in accordance with

policies and practices that existed before the Case was filed, and in the event an employee requests a cash payout relating to earned paid time off, however, the cash payment shall be limited by the **$13,650.00** maximum payment as provided by the Bankruptcy Code. Any Priority Wage Claims that exceed the **$13,650.00** statutory maximum shall constitute General Unsecured Claims. The Purchaser may, but is not obligated to, assume certain liabilities to employees of the Debtor in the event that the Purchaser hires such employees as part of the Sale Transaction.

Class Five Claims are unimpaired and are not entitled to vote on the Plan. To the extent any Class Five claims exist, the Plan Officer will pay each claim in full in cash on the later of the Effective Date or the date that such claim is Allowed, unless the claimant and the Plan Officer agreed to a different treatment. All Priority Tax Claims of the United States shall be paid shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(C) and (D), and the United States does not consent to different treatment.

Class Six Claims are impaired and are entitled to vote on the Plan. On the Effective Date, each holder of an Allowed Class Six claim will receive a pro rata interest in the Liquidating Trust and become the sole beneficiaries of the Liquidating Trust. The Plan Officer will transfer cash in the amount of $653,747.00 to the Liquidating Trust and assign certain claims and causes of action (described above) to the Liquidating Trust. The Liquidating Trustee shall, in his discretion, distribute the assets and proceeds of the Liquidating Trust to beneficiaries pursuant to the documents governing administration of the Liquidating Trust.

**D.     Executory Contracts and Unexpired Leases**

Under the Bankruptcy Code, the APA, and the Plan, the Purchaser may elect to assume, and the Plan Officer may assign, certain of the Debtor's executory contracts and unexpired leases, subject to the terms of Bankruptcy Code § 365. Those assumed executory contracts and leases are set forth in the APA. Any executory contract or lease not assumed by the Purchaser is deemed rejected, and the counterparty to any rejected contract or lease must file a proof of claim for its damages by the later of (i) 30 days of entry of the order confirming the Plan or (ii) 30 days of notice of rejection of the executory contract or unexpired lease.

**E.     Allowance of Pre-Petition Claims**

The Bankruptcy Code provides for pre-petition claims to be asserted in two ways. First, a creditor may file a proof of claim with the Bankruptcy Court on the appropriate official form. Notice was mailed to all known creditors of the Debtor stating that, except for certain types of claims specified in the notice, proofs of claim must be filed by January 16, 2020 (the "Bar Date"). Second, a creditor is excused from the requirement of filing a proof of claim if: (1) the creditor's claim is listed in the Debtor's schedule of liabilities; (2) it is not listed in the schedules as an obligation that is disputed, unliquidated, or contingent; and (3) the creditor agrees with the scheduled amount and nature of the claim.

Under the Plan, once a creditor has asserted a claim in one of the ways described above, the claim will automatically be "Allowed" and paid in accordance with the Plan unless the Liquidating Trustee, Plan Officer, or another interested party files an objection within 60 days of entry of the order confirming the Plan. If an objection to a claim is filed, the creditor will be sent

a copy of the objection and will have an opportunity to submit a response and, if appropriate, be heard by the Bankruptcy Court. The Plan provides that no distribution will be made on account of any claim as to which an objection is filed until the objection is resolved and the claim is Allowed.

**F.      Allowance of Post-Petition Claims**

Any creditor owed money for goods or services provided to the Debtor after the Petition Date may hold what is known as an "administrative expense" claim, which is an Unclassified Claim under the Plan. Administrative expenses include any amounts owed to professionals retained by the Debtor or the Committee. Any party owed an administrative expense must file a request for allowance and payment of such claim within 30 days after the Bankruptcy Court enters an order confirming the Plan. Unless the Liquidating Trustee, Plan Officer, or another interested party files an objection to such a request within 30 days after this deadline, the administrative expense will automatically be "Allowed" and paid in accordance with the Plan.

**G.      Discharge**

Pursuant to § 1141(d) of the Bankruptcy Code, confirmation of the Plan discharges the Debtor from all of pre-petition debts, except to the extent that the Plan provides for payment of such debts. For a complete description of the discharge, please refer to Article IX, § 9.2 of the Plan.

**H.      Injunction and Stay**

The entry of an order confirming the Plan by the Bankruptcy Court will constitute an injunction applicable to all persons, staying and enjoining the enforcement of all liens, claims, and debts discharged pursuant to the Plan. In the event of default under the Plan that is not cured in accordance with the Plan, and unless the Bankruptcy Court orders otherwise, the injunction is to be deemed dissolved without further order of the Bankruptcy Court. For a complete description of the injunction and stay, please refer to Article X, § 10.4 of the Plan.

**I.      Acceptance and Confirmation of the Plan**

**1.      Acceptance by Impaired Classes**

The Bankruptcy Code provides that any class of creditors or interest holders whose rights are "impaired" (in general terms, not fully honored) under the Plan has the right to vote, as a class, to accept or reject the plan. Under the Plan, claims that have been objected to and not allowed have no right to vote to accept or reject the Plan, except as otherwise ordered by the Bankruptcy Court. A class of creditors accepts the Plan if more than one-half of the ballots that are timely received from members of the class, representing at least two-thirds of the dollar amount of claims for which ballots are timely received, are cast in favor of the Plan. If a Plan impairs any class of claims, then, among other requirements, at least one class of claims must vote to accept the Plan in order for it to be confirmed. Under the Plan, Classes One and Six are impaired, and entitled to vote to accept or reject the Plan. The remaining classes are unimpaired and thus are not entitled to vote. For a complete description of the impaired and unimpaired classes of creditors, please refer to Article III of the Plan.

14

### 2.      Best Interest of Creditors Test

To obtain confirmation of the Plan, the Debtor must also satisfy the so-called "best interest of creditors" test embodied in § 1129(a)(7) of the Bankruptcy Code. This test requires that the Plan provide each non-accepting creditor with at least as much value as it would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. For the reasons set forth in Section 6 below, the Plan Proponents submit that the Plan satisfies this test.

### 3.      Cramdown

If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan it "does not discriminate unfairly" and is "fair and equitable" as to the non-accepting class. Confirmation over the objection of an impaired class is known as "cramdown" and is governed by § 1129(b) of the Bankruptcy Code. The Plan Proponents have requested the Plan be confirmed over the objection of any impaired class.

## J.      Analysis of Risk Factors

There are, of course, certain risks that could potentially prevent the Plan from being fulfilled. There is a possibility that the Debtor will propose a competing plan, including a plan that does not contemplate a sale of the Purchased Assets to the Purchaser. However, the Debtor has not formulated a plan or proposed plan terms to date. As to Class One, the amount of recovery is subject to variation based on the amount of cash available on the Effective Date, the amount of accounts receivable recovered, and the amount of administrative expenses and priority claims ultimately Allowed and paid from funds that might otherwise be available to satisfy Class One claims. Additionally, the Purchaser may default on the promissory note delivered to USDA, diminishing its recovery. As to Class Six, the Liquidating Trustee's avoidance and recovery of preferential transfers might be less than the estimated recovery rate, which would reduce funds available from the Liquidating Trust for the benefit of Class Six creditors. These risks, however, are essentially unquantifiable and are not, in the Plan Proponent's opinion, grounds for any creditor to vote against this Plan. The Plan Proponents do not believe that these risks will undermine their ability to satisfy the obligations under the Plan. The Plan Proponents believe that the Plan provides the best path to maximize recovery for all the Debtor's creditors as rapidly as possible.

## K.      Waiver of the 14-Day Stay

The Plan Proponents have requested that the Bankruptcy Court waive the fourteen-day stay that would otherwise apply to the effectiveness of the order confirming the Plan. Waiver of this stay is essential to allow the Purchaser and the Plan Officer to immediately enter into the Management Agreement and move promptly toward closing of the sale of the Debtor's assets promptly, which is a requirement of the APA. Additionally, waiver of the stay will allow the Effective Date to immediately occur, which will expedite distributions under the Plan to the holders of Allowed claims. Finally, upon the occurrence of the Effective Date, the Plan Officer intends to immediately seek a Paycheck Protection Program loan (a "PPP Loan"), the deadline for to apply is March 31, 2021.

15

# VI.
## ALTERNATIVES TO THE PLAN

There are two possible alternatives to the Plan: first, a liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code and, second, the continued operation of the Debtor's business under a plan of reorganization proposed by the Debtor.   Each is discussed below.

## A.    Reorganization Under Chapter 11

There is a possibility that the Debtor will propose a plan that proposes a reorganization under chapter 11 of the Bankruptcy Code, rather than a sale of the Purchased Assets to the Purchaser as contemplated by the Plan.[3]  Under a plan of reorganization, the Debtor would value its assets and distribute at least this amount to the holders of Allowed claims over a period of time from funds generated by operation of the Debtor's hospital and healthcare business.

While it is possible that the Debtor could propose a plan of reorganization that proposes to pay impaired creditors more than what is proposed in the Plan, there are at least two good reasons why this alternative is inferior to the Plan.  First, under a plan proposed by the Debtor, the Debtor's existing management would retain control over the Debtor and its operations under a plan of reorganization.  This is significant because the Debtor has experienced many years of operating losses under current management, and those losses have not abated during this chapter 11 case.  Thus, the Plan Proponents question whether the Debtor could perform under any alternative plan that proposes to pay creditors more than the Plan.  It is for that reason that the Plan Proponents recommend and endorse the Plan – it provides certainty for creditors about what they will receive and when they will receive it, and it entails much less risk for all creditors.

Second, the only impaired classes under the Plan are Class One (KTC and USDA) and Class Six (general unsecured creditors).  Both KTC and USDA have negotiated a treatment under the Plan that is acceptable to them and support the Plan.  Thus, while the Debtor could propose to pay them more under an alternative plan, it is the choice of KTC and USDA to support the Plan instead, which is what they have done.  The Committee has also negotiated a treatment for general unsecured creditors that it believes is in the best interests of all general unsecured creditors.  While any general unsecured creditor is free to vote on any plan as it chooses, the Committee is a fiduciary of all general unsecured creditors and strongly recommends confirmation of the Plan and rejection of any alternative proposed by the Debtor.

For these reasons, the Plan Proponents submit that a plan of reorganization proposed by the Debtor is inferior to the Plan.

## B.    Liquidation Under Chapter 7

Another alternative to the Plan is to liquidate the Debtor's assets under chapter 7 of the Bankruptcy Code.  Under the Bankruptcy Code, the Debtor's case cannot be involuntarily converted to a chapter 7 liquidation, and the Debtor has not sought to convert the case to a chapter 7.  In the event the case is converted to chapter 7, a chapter 7 trustee would assume control of the

---

[3] For the avoidance of doubt, the Debtor has not proposed a plan of reorganization or terms of a plan of reorganization to date and its exclusive right to do so has long since expired without any attempt to extend it.

Debtor's assets and liquidate those assets or simply turn certain assets over to the secured creditors of the Debtor. The proceeds of any sales will be distributed to creditors in accordance with the terms of the Bankruptcy Code. Thus, both the Plan and a chapter 7 case would result in liquidation of all the Debtor's assets. However, the net proceeds of a chapter 7 liquidation would likely be less, and thus would likely result in lower distributions to creditors than the negotiated solution set forth in the Plan. Moreover, under the current Plan structure, the hospital will remain open and operating, which will ensure that this rural area does not lose access to the critical services provided by the hospital. However, a chapter 7 liquidation would likely result in the closure of the hospital

First, under the Plan, KTC and USDA have agreed that certain assets will be available for distribution to general unsecured creditors. In the event of a chapter 7 liquidation, these issues would likely be litigated and some or all of the assets available under the Plan for general unsecured creditors would not be available. The costs and risk of such a litigated result are inferior to the settlement embodied by the Plan.

Second, under the Plan, the Purchased Assets are sold to the Purchaser for an agreed price. It is likely that the delay caused by a chapter 7 case might cause the Purchaser to abandon its efforts to acquire the Purchased Assets altogether, or to insist on a lower sale price. Additionally, the sale price for the Purchased Assets has been negotiated with KTC and USDA, who have agreed to release their liens on the Purchased Assets in exchange for the purchase price and other treatment provided by the Plan. Additionally, although a chapter 7 trustee has the authority to operate a business, in the Plan Proponents' experience, this is rarely done. This means that the Debtor would likely be shut down and "go dark" before a chapter 7 sale, which would adversely impact its sale value. For these reasons, a chapter 7 liquidation would risk the consideration offered by the Purchaser for the Purchased Assets.

Third, the cost of a chapter 7 liquidation is likely higher than the process proposed by the Plan. A chapter 7 trustee would have no experience with the Debtor's business, assets, and liabilities, and would therefore need to "learn on the job." Additionally, the chapter 7 trustee would likely hire legal counsel and other professionals, who would likewise have no experience with the Case. Furthermore, a chapter 7 trustee is entitled to a statutory commission for all distributions made by the chapter 7 estate. By contrast, the Plan Officer and Liquidating Trustee and their advisors already have great knowledge of the Debtor's operations, assets, and liabilities due to their retention by the Committee during the Case, thus lowering the costs of the sale and plan process. By lowering costs, the Plan Officer and Liquidating Trustee will increase the dividend to creditors beyond what they would receive in a hypothetical chapter 7 bankruptcy case.

For all these reasons, the Plan Proponents submit that a chapter 7 liquidation is inferior to the Plan.

## VII.
## VOTING

Enclosed with this Disclosure Statement is a ballot for your use in voting to accept or reject the Plan. In order for your vote to count, and if you are a creditor of the Debtor, your properly completed and executed ballot must be received **not later than 5:00 p.m. (Eastern Time) on _____, 2021** at the office of the Committee's counsel:

Official Committee of Unsecured Creditors of Calais Regional Hospital
c/o Jeremy R. Fischer
**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
Facsimile:  (207) 772-3627
Email: jfischer@dwmlaw.com

## VIII.
## MODIFICATION OF PLAN

The Plan Proponents may propose amendments or modifications to the Plan as provided in § 1127 of the Bankruptcy Code.  If all parties adversely affected by any modifications consent to such modification, this Disclosure Statement shall be deemed adequate without modification and no further notice shall be required or given.  In all other cases, the Bankruptcy Court may require a new disclosure statement and/or re-voting under the Plan as amended or modified.  In addition, the Plan Proponents may, with the approval of the Bankruptcy Court, modify or amend the Plan through the Bankruptcy Court's order confirming the Plan.

## IX.
## FEDERAL AND OTHER TAX CONSEQUENCES

Each holder of a claim is strongly urged to consult a tax advisor for information regarding any federal, state, or local tax consequences of the treatment of such holder's claim under the Plan.

## X.
## CONCLUSION AND RECOMMENDATION

The Plan Proponents believes that the Plan represents the best possible means of satisfaction of all creditor claims, and is fair and equitable to all parties.   The Plan Proponents therefore recommend that all impaired creditors vote to accept the Plan.

Date: February 19, 2021                     */s/ Jeremy R. Fischer*
                                       Jeremy R. Fischer
                                       Kellie W. Fisher
                                       **DRUMMOND WOODSUM**
                                       84 Marginal Way, Suite 600
                                       Portland, Maine 04101-2480
                                       Telephone: (207) 772-1941
                                       E-mail: jfischer@dwmlaw.com
                                                 kfisher@dwmlaw.com

                                       *Counsel to the Official Committee of Unsecured
                                       Creditors*

                                       -and-

                                       */s/ Roger A. Clement, Jr.*
                                       Roger A. Clement, Jr.
                                       **VERRILL DANA LLP**
                                       One Portland Square Portland, ME 04101-4054
                                       Telephone: (207) 774-4000
                                       E-mail: rclement@verrill-law.com

                                       *Counsel to Katahdin Trust Company*

## DISCLAIMER

**THIS DISCLOSURE STATEMENT AND THE PLAN,[4] AND THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE PLAN PROPONENTS TO KNOWN HOLDERS OF CLAIMS PURSUANT TO § 1125 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE PLAN PROPONENTS.**

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THEN YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS, AS JOINT PLAN PROPONENTS, URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE.  NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY, OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATION FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THEN THE PLAN SHALL CONTROL.  ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES**

---

[4]     Capitalized terms not otherwise specifically defined in this Disclosure Statement shall have the meaning attributed to them in the Plan.  Each definition in this Disclosure Statement is intended to include both the singular and plural.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARDING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL,

OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN
LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS
CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS
CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND OTHER THIRD PARTIES SHOULD BE AWARE
THAT THE PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY
MATERIALLY AFFECT THEIR RIGHTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON
THE ANALYSIS PERFORMED BY THE PLAN PROPONENTS AND ITS
PROFESSIONALS. ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY
EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED
HEREIN AND IN ANY EXHIBITS ATTACHED HERETO, THE PLAN PROPONENTS
CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE
ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER
ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL
NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR
LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE PLAN
PROPONENTS' STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE PLAN PROPONENTS RECOMMEND THAT CREDITORS SUPPORT AND
VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE PLAN PROPONENTS
THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A
GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER
OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE
DEBTOR UNDER CHAPTER 7. ACCORDINGLY, THE PLAN PROPONENTS
BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF
CREDITORS.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
_____, UNLESS EXTENDED BY ORDER OF THE
UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MAINE.

YOUR VOTE ON THE PLAN IS IMPORTANT.